Pursuant to Ind.Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before
any court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the
case.



**FILED**

Mar 08 2013, 8:28 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**J. BRAD VOELZ**
Warsaw, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RICHARD D. WEBSTER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IVAN GONZALEZ, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 43A03-1207-CR-334 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE KOSCIUSKO CIRCUIT COURT
The Honorable Rex L. Reed, Judge
Cause No. 43C01-1202-FA-114

**March 8, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Ivan Gonzalez appeals his convictions for two counts of intimidation as class D felonies and visiting a common nuisance as a class B misdemeanor. Gonzalez raises three issues which we consolidate and restate as whether the evidence is sufficient to sustain his convictions. We affirm.

The facts most favorable to Gonzalez's convictions follow. At around 2:00 or 2:30 a.m. on February 26, 2012, Debbie Servan was at her home near Warsaw, Indiana, when she heard "a sharp rapping" at her door, and when she went to answer her door she "heard somebody on the other side saying, help me, help me" and that "he's shooting at me." Transcript at 133-134. Servan called 911.

Deputy Donald McCune with the Kosciusko County Sheriff's Department responded to the 911 call and arrived at Servan's residence. Deputy McCune spoke with the man who knocked at Servan's residence, whom he identified as Fernando Cruz, and Cruz stated that he had left a residence "to the west" where men named Baldemar Robles, or "Baldo," and his brother-in-law Gonzalez lived, because people were shooting at him. Id. at 145. Deputy McCune was familiar with Robles and Gonzalez and wanted Cruz to confirm that he came from the residence the Kosciusko County Drug Task Force had been surveilling for approximately six months. Deputy McCune contacted Detective Paul Heaton, who also was familiar with Robles and Gonzalez, and the three men met at a church down the road. Cruz stated to Detective Heaton that he had been invited to a party by Robles and, while at the party, people started accusing him of being a police informant, the situation became physical, and they threatened to tie him up and "make a piñata out of him" but he was able to flee. Id. at 178. Cruz then directed Detective

2

Heaton to the residence, and when they returned and confirmed for Deputy McCune that Cruz had in fact been at the correct residence, Deputy McCune decided to call more officers to the scene and proceed to the home.

Upon arriving and pulling into the driveway, Deputy McCune observed Robles urinating, and Robles turned, headed for the garage, opened it, said something in Spanish, and stood in the doorway. Deputy McCune then asked Robles to step inside the garage so that they could talk about what happened with Cruz. Upon entering, Deputy McCune observed a number of people inside and a plastic CD case with a white crystal-like substance on it which field-tested positive for cocaine, and a razor blade which is used for breaking the substance down into a powder. Robles told Deputy McCune that they were simply having a party and that he did not know anything about what Cruz had told Deputy McCune.

Deputy McCune observed Gonzalez sitting in an upright position with his hood pulled up and his hands folded, and when Deputy McCune stated that he intended to obtain a search warrant for the premises, Gonzalez rose to his feet and said that his ID was in the house and that he would go inside to retrieve it. Deputy McCune told Gonzalez that he was not allowed to leave the garage which upset Gonzalez, Deputy McCune "put [his] hand out to stop him," and they "had a little moment where [they] squared off with one another." Id. at 149-150. Gonzalez then told Deputy McCune that he knew where he lived, which Deputy McCune perceived as a threat and placed him in fear because he has a wife and child who live with him. Deputy McCune obtained a search warrant and began arresting people including Gonzalez, and when Gonzalez was

3

in handcuffs with Detective Heaton he stated to Deputy McCune in an aggressive fashion that "you've f'd with the wrong people and you're on the list, stuff of that nature" which also placed Deputy McCune in fear of physical harm to himself or his family due to the fact that "[t]he drug world is violent by nature." Id. at 152.

Gonzalez also told Detective Heaton when he was transporting Gonzalez to the responding units that "you f---ed with the wrong person" and that "I'll see you around. You're on the list. You know, I'll be out soon." Id. at 184-185. Detective Heaton believed the statement to be a threat which was credible due to his familiarity with Gonzalez, and he was fearful for his children and wife that Gonzalez might retaliate in some fashion.

In the garage, Sergeant Mike Mulligan located ten to twelve pounds of marijuana contained in "numerous" bags in the back of a white car which was parked in the garage and was not in working condition. Id. at 157. Deputy McCune also observed a "marijuana smoking pipe," a "jeweler's bag" containing a white crystal-like substance which he believed to be cocaine, and a set of small digital scales containing white residue which are commonly used in the drug trade, in the garage, along with bottles of hard liquor and beer. Id. at 156. Detective Heaton observed a pill grinder containing marijuana, a plastic bag containing a white powder substance, and large digital scales which are used for weighing heavier quantities of marijuana, as well as a statue and a candle depicting "La Santa Muerte," which is "[t]he drug traffickers' god" along with "pictures of Ivan Gonzalaz [sic] and Baldemar Robles to the left of that as well as a money tree" which, Detective Heaton knew based upon his training and experience was

4

significant because it was used as a "protector of drug traffickers and, you know, take care of their family." Id. at 201.

Detective Heaton recovered from the kitchen a "corner baggie that was pulled off" and was next to a "white bottle" which he recognized as a way drug traffickers package drugs. Id. at 202. In the bedroom, Detective Heaton recovered two knives with white powder on them and more digital scales, as well as white powder on a table which he believed to be cocaine. Underneath the bed, Detective Heaton recovered a bag containing cocaine and a little over half a pound of marijuana. He recovered cocaine from a bag in the heel of a shoe, as well as several documents containing Gonzalez's name from a dresser drawer. Also, taped to the back of the bedroom closet door was a "drug ledger." Id. at 206. Inside the closet was a purse containing $4,667.00. Detective Heaton searched a Lincoln Navigator which he had previously witnessed Gonzalez driving on several occasions and recovered a large amount of currency from the center console. Also, currency and a "Tupperware" container with a large amount of rice and three bags of a white substance which Officer Brad Kellar believed were one ounce increments of cocaine, were recovered from another vehicle, a Saturn Vue, parked at the residence. Id. at 267. Currency was recovered from other places in the residence as well, and all totaled, around $26,000.00 was recovered from the search of the property.

On February 28, 2012, the State filed information charging Gonzalez with crimes including dealing in cocaine more than three grams as a class A felony, possession of cocaine in excess of three grams as a class C felony, dealing in marijuana in an amount in excess of thirty grams as a class C felony, and three counts of intimidation as class D

felonies. On March 13, 2012, the State filed a motion to consolidate its cases against Gonzalez, Louis Juarez, Ruby Gonzalez, Aaron Drumm, and Robles, Gonzalez filed a motion objecting to the State's motion for consolidation on March 16, 2012, and on April 3, 2012, the court denied the State's motion. On May 3, 2012, the State filed an amended information charging Gonzalez with Count I, possession of cocaine as a class D felony; Count II, intimidation against Cruz as a class D felony; Count III, intimidation against Detective Heaton as a class D felony; Count IV, intimidation against Deputy McCune as a class D felony; Count V, visiting a common nuisance as a class B misdemeanor; and Count VI, neglect of a dependent as a class C felony.

On May 9, 2012, the court commenced a jury trial at which evidence consistent with the foregoing was presented. On May 11, 2012, the third day of trial, the jury found Gonzalez guilty of Counts III, IV, and V and not guilty of Counts I, II, and VI. On June 7, 2012, the court held a sentencing hearing and sentenced Gonzalez to two and one-half years on each of Counts III and IV and 180 days on Count V, all to be served concurrently. Thus, Gonzalez was sentenced to an aggregate term of two and one-half years in the Department of Correction.

The issue is whether the evidence is sufficient to sustain Gonzalez's convictions for intimidation and visiting a common nuisance. When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. Bailey v. State, 907 N.E.2d 1003, 1005 (Ind. 2009). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." Id. We will affirm if there is substantial evidence of

6

probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. Id. It is well established that "circumstantial evidence will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt." Pratt v. State, 744 N.E.2d 434, 437 (Ind. 2001). We address Gonzalez's convictions for (A) intimidation; and (B) visiting a common nuisance, separately.

A.      Intimidation

The offense of intimidation is governed by Ind. Code § 35-45-2-1, which provides in part that "[a] person who communicates a threat to another person, with the intent . . . that the other person be placed in fear of retaliation for a prior lawful act . . . commits intimidation, a Class A misdemeanor," and "the offense is a . . . Class D felony if . . . (B) the person to whom the threat is communicated . . . is a law enforcement officer . . . ." A "threat" is "an expression, by words or action, of an intention to . . . unlawfully injure the person threatened or another person, or damage property; [or] commit a crime . . . ." Ind. Code § 35-45-2-1(c). "Whether a communication is a threat is an objective question for the trier of fact." Ajabu v. State, 677 N.E.2d 1035, 1041 (Ind. Ct. App. 1997), trans. denied. Intent is generally determined from a consideration of the defendant's conduct and the natural and usual consequences of such conduct, and the trier of fact must usually resort to reasonable inferences based upon an examination of the surrounding circumstances. Hendrix v. State, 615 N.E.2d 483, 484-485 (Ind. Ct. App. 1993) (citing Metzler v. State, 540 N.E.2d 606, 609 (Ind. 1989)).

7

Gonzalez argues that the State failed to prove the elements of either of his intimidation convictions. He asserts that his "actions did not constitute a threat" because they do not fit within the definition of threat in Ind. Code § 35-45-2-1(c) and they "were never connected at trial with an intent to place the officers in fear, nor did the State argue that to the jury." Appellant's Brief at 8. Gonzalez argues that the statements at issue were not specified in the charging information, and accordingly "one may only speculate" which statements "were the threats relied upon by the jury to convict Gonzalez." Id. at 9. He also argues that the jury was again asked to speculate regarding the "prior lawful act" by the officers relating to Gonzalez's statements. Id. at 10.

The State argues that it introduced evidence demonstrating that Gonzalez made threatening statements to Deputy McCune in response to the officer detaining him, and again after Gonzalez had been handcuffed, and he threatened Detective Heaton in response to being handcuffed and escorted to a squad car. The State argues that both officers indicated in their testimony that they "were familiar with [Gonzalez] and took his threats as serious threats toward themselves and their respective families." Appellee's Brief at 12.

To the extent that Gonzalez argues that he did not threaten either officer or intend to place the officers in fear, our review of the record reveals that Gonzalez told Deputy McCune that he knew where he lived and soon after stated in an aggressive fashion that "you've f'd with the wrong people and you're on the list, stuff of that nature." Transcript at 152. Deputy McCune testified at trial that these statements placed him in fear of physical harm to himself and his family due to the fact that "[t]he drug world is violent

8

by nature." Id. Gonzalez also told Detective Heaton that "you f---ed with the wrong person" and that "I'll see you around. You're on the list. You know, I'll be out soon." Id. at 184-185. Detective Heaton testified that, based upon his familiarity with Gonzalez, he believed the statement to be a credible threat to the safety of his children and his wife and was made fearful for their safety. Thus, these statements could be interpreted, and indeed were interpreted by the officers, as indications that Gonzalez intended to visit the officers' homes and harm the officers or their families, and accordingly they were sufficient to prove that Gonzalez's words were a "threat." Gonzalez's arguments on appeal are an invitation to reweigh the evidence, which we will not do. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied.

As noted by Gonzalez, "the State must establish that the legal act occurred prior to the threat and that the defendant intended to place the victim in fear of retaliation for that act." Casey v. State, 676 N.E.2d 1069, 1072 (Ind. Ct. App. 1997). Here, the evidence most favorable to the verdicts reveals that Deputy McCune prevented Gonzalez from leaving the garage which upset Gonzalez, and the two men "had a little moment where [they] squared off with one another." Transcript at 149-150. Gonzalez was subsequently placed in handcuffs and, in retaliation for being placed in handcuffs and being led to a vehicle for transport, made the statements to both officers about being on "the list" and that they were becoming involved with the wrong person or people. This evidence is sufficient to support the jury's conclusion that Gonzalez's threats were intended to place the officers in fear of retaliation for a prior lawful act.

9

We therefore conclude that evidence of probative value exists from which the jury could have found Gonzalez guilty beyond a reasonable doubt of intimidation as class D felonies against Deputy McCune and Detective Heaton. See Slayton v. State, 755 N.E.2d 232, 237 (Ind. Ct. App. 2001) (holding that the evidence was sufficient to sustain the defendant's conviction for intimidation as a class D felony where the defendant repeatedly told the officer that "he 'was going to get' him and that he had 'better watch [his] back'").

B.      Visiting a Common Nuisance

The offense of visiting a common nuisance is governed by Ind. Code § 35-48-4-13(a), which provides that a "person who knowingly or intentionally visits a building, structure, vehicle, or other place that is used by any person to unlawfully use a controlled substance commits visiting a common nuisance[.]"  "To convict a defendant of visiting a common nuisance, the State must prove that the defendant knew the building, structure, vehicle, or other place that he visited was used for the unlawful use of a controlled substance." Traylor v. State, 817 N.E.2d 611, 620 (Ind. Ct. App. 2004) (citing Hale v. State, 785 N.E.2d 641, 643 (Ind. Ct. App. 2003)), reh'g denied, trans. denied.  "[T]he term 'common nuisance' as used in the statute requires proof of a continuous or recurrent violation." Zuniga v. State, 815 N.E.2d 197, 200 (Ind. Ct. App. 2004).  Thus, the State must show that the place visited by the defendant was used on more than one occasion for the unlawful use of a controlled substance. Id. (citing Hale, 785 N.E.2d at 643).

Gonzalez argues that although the State "presented evidence of relatively large amounts of drugs, including cocaine and marijuana, in the house, the garage, and

10

concealed in a car," as well as drug paraphernalia, a ledger alleged to be consistent with a drug dealing operation, and a large amount of cash, it "failed to present evidence that any of these items had been used or even present on any occasion prior to February 26, 2012, or to present any evidence that the property had been used for illegal use of controlled substances prior to that date." Appellant's Brief at 12-13. The State argues that it presented evidence of a probative value to demonstrate Gonzalez knew that the residence, and the garage in particular, was being used for the unlawful use of a controlled substance, including CD cases with cut marks and razor blades used to cut cocaine and containing cocaine, zip-lock baggies containing a white powdery substance, a pill grinder with marijuana residue, and a digital scale. The State argues that the evidence including approximately 100 grams of cocaine, ten and one-half pounds of marijuana, pipes for smoking marijuana, multiple digital scales, and currency totaling approximately $26,000.00, all of which were recovered from the residence, established that it had been used on more than one occasion for the unlawful use of illegal narcotics.

The evidence most favorable to Gonzalez's conviction reveals that the State established that the residence had been used more than once for unlawfully using narcotics. As a result of the search of the property, the police recovered at least ten pounds of marijuana, contained in numerous bags, hidden in a non-working vehicle in the garage. A large amount of cocaine was also recovered. There were numerous digital scales of varying sizes and containing white powder present in the garage and the residence which the officers testified were indicative of a drug dealing operation. Further, the officers recovered a pill grinder with marijuana residue, a marijuana smoking

11

pipe, baggies in which a corner had been removed, knives with white powder on them, and a "drug ledger" taped to the bedroom closet door, as well as around $26,000 in cash. Transcript at 206. Also, Detective Heaton testified that he observed a statue and a candle depicting "La Santa Muerte," which is "[t]he drug traffickers' god" along with "a money tree" which Detective Heaton knew based upon his training and experience was significant because it was used as a "protector of drug traffickers and, you know, take care of their family." Id. at 201.

Based upon our review of the record, we conclude that evidence of probative value exists from which the jury could have found Gonzalez guilty beyond a reasonable doubt of visiting a common nuisance as a class B misdemeanor. See Traylor, 817 N.E.2d at 620 (holding that it was reasonable for the jury to infer from the evidence presented, including a briefcase recovered from the garage containing a baggie of methamphetamine and a glass pipe used for the consumption of methamphetamine, as well as "glass pipes, some with burnt residue, in other parts of the residence," that the "residence was used more than once for the consumption of methamphetamine" and was therefore a common nuisance).

For the foregoing reasons, we affirm Gonzalez's convictions for intimidation as class D felonies and visiting a common nuisance as a class B misdemeanor.

Affirmed.

BAILEY, J., and VAIDIK, J., concur.

12